### BENNY SMITH V. THE STATE.

#### *No. 510.    Decided June 29.*

1. **Murder—Charge as to Retreat Unnecessary, When—Self-Defense.**—On a trial for murder, where the defendant had testified that "deceased put his hands behind him and took a step towards me," and the court instructed the jury, that if they believed "that deceased threw his hand behind him as if to draw a weapon, and that defendant had reason to believe, viewed from his standpoint, that he was in danger of his life or of serious bodily injury, although in point of fact no such danger existed, and acting under such fear or apprehension defendant cut and killed deceased, his conduct would be justifiable in law, and you should find him not guilty," *Held*, that under the facts of the case the charge was not defective in that it failed to further instruct the jury that defendant was not bound to retreat before killing in self-defense.

2. **Same—Supervening Cause of Death.**—On a trial for murder, where the evidence showed that deceased was carried to the hospital; never got out of bed; lived some two or three weeks after he was wounded, and was attended by physicians who sewed up his wounds, one of whom testified to the nature and character of said wounds, and that such wounds would kill: *Held*, there was nothing in the evidence to suggest a supervening cause for the death, and the court did not err in failing to instruct the jury in conformity with the provisions of article 547 of the Penal Code, that the destruction of life must have been complete by the act, agency, etc., of the defendant.

3. **Recalling Jury and Amending Charge.**—Where the jury, after the case was submitted, were retiring, and the court recalled them and added to the charge, "if malice be fully conceived and formed, it is not material how long it existed," *Held*, there was no error.

APPEAL from the Criminal District Court of Galveston. Tried below before Hon. E. D. CAVIN.

Appellant was indicted for the murder of one John Green by stabbing him with a knife, and at his trial was convicted of murder of the second degree, with the punishment assessed at twelve years' imprisonment in the penitentiary.

The case is sufficiently stated in the opinion.

*Lovejoy & Sampson* and *Spencer & Kincaid*, for appellant.—Under the evidence of the res gestæ in this case the court erred in not charging the jury that the death of deceased must have been completed by the act of defendant, as required by article 547 of the Penal Code; especially so in view of the fact that none of the physicians in attendance on the deceased were called to testify, and the old colored man, the only witness who testified as to his death, said, "I am not a doctor, and can not say that deceased died from being cut more than I have said already."

The verdict and judgment are contrary to the evidence, in this, that it does not appear beyond a reasonable doubt that there was an intention to kill deceased, and this doubt is strengthened by the failure of the State to call to the stand as a witness the physician who attended the deceased in his last illness; such evidence is primary; and in the secondary evidence of Milton Smizer it appears that the primary evidence existed, and that he could not speak with certainty as to the cause of death.

The question of the deadly character of the knife used, the intent to kill in the use of it by the appellant, and the cause of deceased's death, all being in doubt, the duty was devolved upon the court of giving in charge to the jury that the death of deceased must have been completed by the act of defendant; and the further charge, "that the instrument or means used by which a homicide is committed are to be taken into consideration in judging of the intent of appellant."

The destruction of life must be complete.    Penal Code, art. 547. Means or instrument used must be considered in judging of intent. Penal Code, arts. 612–614.

The converse of the proposition embodying defendant's theory of the case must be given affirmatively.   Lester's case, 2 Texas Crim. App., 450; White's case, 18 Texas Crim. App., 57; Alexander's case, 25 Texas Crim. App., 260; Bonner's case, 29 Texas Crim. App., 223; Boyd's case, 28 Texas Crim. App., 139; Nichols' case, 24 Texas Crim. App., 138; Thompson's case, 24 Texas Crim. App., 386.

The court erred in not instructing the jury, as required by article 573 of the Penal Code, in connection with the charge on self-defense, that the defendant, if unlawfully attacked by the deceased, was not bound to retreat in order to avoid the necessity of killing the assailant. Bell's case, 17 Texas Crim. App., 538; Otto's case, 19 Texas Crim.

App., 126; Parker's case, 22 Texas Crim. App., 105; White's case, 23 Texas Crim. App., 154; Williams' case, 30 Texas Crim. App., 447.

The court erred, in this, that after the court had read the entire charge to the jury, and they were retiring from the court room, the court called them back and read aloud to them the following additional charge, to wit: "If malice be fully conceived and formed, it is not material how long it has existed." And in so doing the court called the marked attention of the jury to the added sentence of the charge and gave undue prominence to the same, and impressed the jury with the conviction that in the opinion of the court malice had been proven; and in fact the words added to the charge can only apply to the facts in proof of express malice, and not to murder in the second degree, where the malice is implied by law.

As to giving undue prominence to any principle of law involved in a case: Bonner's case, 29 Texas Crim. App., 232; Irvine's case, 20 Texas Crim. App., 12.

As to charge that if malice be fully conceived and formed, it matters not how long it existed, as applicable to murder in the first and not second degree: Atkinson's case, 20 Texas, 531; Halbert's case, 3 Texas Crim. App., 658, 659.

*R. L. Henry*, Assistant Attorney-General, for the State.

HURT, PRESIDING JUDGE.—This is a conviction for murder of the second degree, the punishment being fixed at twelve years in the penitentiary. "The deceased, John Green, drove up in front of the house of Ellen Perry, got off his wagon, went to the gate, knocked on it, and called out, 'Hello.' Ellen Perry came out and asked what he wanted, and he told her he wanted to get some beer barrels. She told him he could not have the beer barrels, and told him to get away, and called him a dirty tramp. Deceased told her he was no more a tramp than she was herself. Then she called to the defendant, 'Benny, do you hear how this nigger is talking to me?' At this defendant said, 'Yes, I heard it,' and came from towards the back of the house and went up to deceased, and said to him, 'Do you know who that is you are talking to? I don't allow anybody to insult my mother.' Deceased replied, 'I have not insulted your mother.' Defendant said, 'I don't allow any damned man to insult my mother,' and deceased again said he had not insulted her. During this time defendant had got around between deceased and his wagon, and I saw deceased start to run and defendant after him, and defendant cut deceased, or cut at him, three times. Defendant had something in his hand. Deceased did not say or do anything to the defendant. All he said to him was that he had not insulted his mother." This is the testimony of Wilson Melton.

Charley Moore was a witness for the State. He testified, that he and deceased went to the house of Ellen Perry to get some empty beer kegs; that Ellen Perry said that the kegs had floated there during a storm, and deceased could not have them. She then said to deceased, "You black nigger tramp, go away from here." Green said back to her he was no more a tramp than she was, and he must have the kegs. Seeing the turn matters were taking, the witness walked to where deceased was standing, just outside the gate, and spoke to Ellen Perry, and told her it was no use to make trouble about the kegs; that we had got to take them if we had to go to the policeman for them, and that would make trouble for her. "I said to her, it made no difference if the kegs had floated out to sea and come back, they would still not be her property, and she had better let us come in and take them. She then said I could come in, but said that black nigger tramp could not; and then called her son, Benny Smith. I tried to talk to her, but about that time Benny Smith came around the house from the back yard, when his mother said, 'Did you hear that nasty nigger tramp, how he insulted your mother?' Smith said yes, he had heard it; and then passed by his mother and went into the house, but soon came out again, and walked to where Green was, and said, 'Did you know that is my mother you are insulting?' Deceased said, 'I have not insulted your mother.' Smith then said he would not allow any damn man to insult his mother. They talked several minutes, deceased repeating that he had not insulted his mother. Smith finally walked around Green and between him and his wagon. Smith then pulled up his vest and jerked a large knife out of his pants and struck at Green, and Green ran and Smith after him. Smith stabbed at him three or four times while he was running. * * * I saw the knife Smith cut Green with. It was a long knife with a hooked bill, and had brass guards, and it was about this long" (the witness indicating about eight or ten inches).

The defendant and his mother, Ellen Perry, testified, to the effect that deceased demanded of her some barrels she had stolen, and on her denying having stolen any barrels, called her a damn lying, thieving bitch; that when defendant came out and asked Green if he knew that was his mother, deceased said, "I don't care; she is a damn thieving, lying bitch and a whore," and placed his hand behind him as if to draw a weapon, and took a step towards defendant; at the same time defendant advanced towards deceased. Defendant further testified: "Deceased put his hands behind him and took a step towards me and I advanced towards him, and I pulled my knife out of my pocket, opened it as I leaped on him, and we clinched. While we were clinched I reached my hand behind him and cut at him. He broke away. * * * I never followed him. The knife I used was my pocket knife, with a blade two and one-half to three inches long.

I did not go into the house.   I went directly from where I was cutting wood to where Green was standing.   *   *   *   I never saw him in my life before.''

The court submitted to the jury the law of murder of the second degree, and of manslaughter, in the general charge; and submitted the issue of self-defense by giving a charge requested and prepared by counsel for defendant.

It is claimed that the court erred in failing to tell the jury that defendant was not bound to retreat before killing in self-defense.   As we have stated, the court gave the charge requested by the defense upon the subject of self-defense, and from the bill of exceptions, as qualified by the trial judge, it appears that the charge was not specially excepted to on the ground urged.   Were it otherwise, we are of opinion that the omission is not error under the facts of this case. The charge given informed the jury, that if they believed from the evidence ''that the deceased threw his hand behind him, as if to draw a weapon, and that the defendant had reasonable grounds to believe, viewed from his standpoint, that he was in danger of his life, or of serious bodily injury, although in point of fact no such danger existed, and acting under such fear or apprehension the defendant cut and killed the deceased, his conduct would be, in law, justifiable, and you should find him not guilty.''   This very clearly and plainly told the jury that if the evidence for the defense was true, to acquit; and the testimony required nothing more to be given upon that subject.

It is complained that the court erred in not charging the jury that the death of the deceased must have been completed by the act of defendant.   The evidence is, that just after the cutting deceased turned faint, and was carried to the corner of the street and laid down.   A doctor came along and sewed up the wounds, and he was then taken to the hospital.   Deceased died at the hospital, about two or three weeks after being brought there.   He never got out of bed.   He was about 16 or 17 years old, and fairly healthy and stout for his age.   A witness states that he died from the effects of being cut.   A surgeon examined his wounds.   He found two stab wounds in the back, one on either side of the spine, and showing a surface cut of about one inch or an inch and a half.   Did not know how deep.   Regarded them as dangerous, and did not probe.   A wound in that part of the body would kill or reach a vital part if an inch and one-half deep.   He sewed up the wounds.

There is nothing in the evidence to suggest a supervening cause for the death; and from the evidence stated it is clear that the death was the natural consequence of the wounds inflicted.   In such state of case it is not error to omit to charge the provisions of article 547, Penal Code.

The charge of the court fully and clearly submitted to the jury, both in the charge on murder and manslaughter, whether the defendant intended to kill or inflict such serious bodily injury as might reasonably and probably result in death; and further, whether the knife was, as used, a deadly weapon, calculated reasonably and probably to produce death.

It is complained that the court erred in calling the jury back when they were retiring, and adding to the charge by writing in the margin thereof the following: "If malice be fully conceived and formed, it is not material how long it has existed." There was no error in this matter.

There was no error in the judgment, and it is affirmed.

*Affirmed.*

Judges all present and concurring.